## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Jennifer Freddette**

    v.

Case No. 17-cv-672-PB
Opinion No. 2019 DNH 003

**Nancy A. Berryhill,**
**Acting Commissioner**
**Social Security Administration**


### MEMORANDUM AND ORDER

Jennifer Freddette challenges the denial of her applications for supplemental security income and disability insurance benefits pursuant to 42 U.S.C. § 405(g). She contends that the Administrative Law Judge ("ALJ") who considered her applications improperly evaluated the medical opinion evidence and Freddette's testimony in assessing her residual functional capacity. The Acting Commissioner, in turn, moves for an order affirming the ALJ's decision. I deny Freddette's motion and affirm the Commissioner's decision.

### I. BACKGROUND

#### A. Procedural Facts

Freddette is a 48-year-old woman with a high school education. See Administrative Transcript ("Tr.") 34. She has previously worked as a commercial cleaner at one facility for 10 years and as a certified nurse's aide at a nursing home for 2-3 years. Tr. 683. Freddette has allegedly been disabled since

July 11, 2014, due to a combination of anxiety disorder, mood disorder, and asthma.  <u>See</u> Tr. 25.[1]

Freddette's applications were initially denied in September 2015.  On January 4, 2017, she testified at a hearing before ALJ Lisa Groeneveld-Meijer, who ultimately denied her applications. Tr. 23.  The Social Security Administration ("SSA") Appeals Council denied Freddette's request for review in October 2017, rendering the ALJ's decision the final decision of the Acting Commissioner.  <u>See</u> Tr. 1-6.  Freddette now appeals.

## B.    **Medical Opinions**

The record reflects medical opinions of three nontreating providers: Dr. Stefanie Griffin, a psychologist who performed a one-time mental consultative examination; Dr. Stuart Gitlow, a psychiatrist who reviewed Freddette's records and testified at the hearing as an impartial medical expert; and Dr. John Warren, a state agency psychologist who rendered his opinion after reviewing the evidence of record.[2]

Dr. Griffin diagnosed Freddette with generalized anxiety disorder, mood disorder, and borderline intellection

---

[1]    In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts.  <u>See</u> Doc. No. 12.  Because that joint statement is part of the court's record, I only briefly recount the facts here.  I discuss further facts relevant to the disposition of this matter as necessary below.

[2]    The record does not contain an opinion from a treating source.

functioning. Tr. 688. She opined that Freddette appeared to require more support than her peers to complete complex daily activities. She explained that Freddette reported heavy reliance on her mother, including managing her household finances. Freddette also regularly forgot to take her medication. Tr. 686.

According to Dr. Griffin, Freddette did not appear capable of maintaining appropriate social interactions with others. She noted that Freddette was polite and cooperative during testing, presented with neutral mood, and had a stable and appropriate affect. Tr. 687. Freddette, however, endorsed symptoms of severe depression and anxiety on self-report measures and reported yelling at her mother out of frustration. Tr. 684, 687. She was "overly timid and apologetic" during the exam, which Dr. Griffin found "consistent with her report that she tends to isolate because of feelings of worthlessness and discomfort around others." Tr. 687.

The results of a Folstein Mini-Mental State Exam that Dr. Griffin administered indicated that Freddette's mental state was "impaired" and her overall intellectual performance was in the borderline impaired range. Tr. 684. Dr. Griffin noted that Freddette had difficulty following a three-step command and had to concentrate carefully while test instructions were being given. Tr. 684, 687. As a result, Dr. Griffin believed that

Freddette was not capable of consistently understanding and remembering complex spoken information or consistently completing complex tasks.  Tr. 687.

In the end, Dr. Griffin concluded that Freddette did not appear capable of adhering to a regular work schedule, maintaining appropriate interactions with others in a work setting, or making work-related decisions.  She explained that this was due to Freddette's intellectual limitations and unmanaged psychiatric symptoms.  Tr. 688.

Dr. Gitlow reviewed all the evidence in the record, including Dr. Griffin's report, and testified at the hearing as an impartial medical expert.  Dr. Gitlow opined that Freddette had moderate limitations in understanding, remembering, and applying information; mild limitations in interacting with others; moderate limitations in concentration, persistence, and pace; and moderate limitations in adapting and managing herself. Tr. 51.  Because of her difficulty managing anger, Dr. Gitlow believed that Freddette "would not do well with a significant number of peers, colleagues, critical supervisors" or the general public but could interact with a limited number of people at work if the same people were there day-to-day.  Tr. 54, 55-56.

Dr. Gitlow testified that Freddette's personality disorder and intellectual function "have been the same, virtually,

4

throughout her adult life" and that she showed "good adaptive functioning despite these problems, including working for a single facility for ten years and working at another facility for two to three years."  Tr. 50.  Although he agreed that Freddette's issues with mood and anxiety "appear to have worsened" over time, Dr. Gitlow testified that she had a "good" but "[n]ot a perfect" response to treatment with medication and therapy.  Tr. 50-51.

State agency psychologist Dr. Warren also reviewed the record evidence.  He opined that Freddette was able to "perform basic tasks and relate with others well enough for routine workplace purposes;" understand and remember simple instructions; carry out simple tasks within acceptable attention, persistence, and pace tolerances; and relate adequately with supervisors and coworkers, but not the general public.  Tr. 106-109.

## C.   __The ALJ's Decision__

The ALJ assessed Freddette's claims under the five-step, sequential analysis required by 20 C.F.R. § 404.1520.  At step one, she found that Freddette had not engaged in substantial gainful activity since July 11, 2014, her alleged disability onset date.  Tr. 25.  At step two, the ALJ found that Freddette's anxiety disorder, mood disorder, and asthma qualified as severe impairments.  Tr. 25.  At step three, the

ALJ determined that none of Freddette's impairments, considered individually or in combination, qualified for any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 26; see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

The ALJ then found that Freddette had the residual functional capacity ("RFC") to perform work at all exertional levels, with the non-exertional limitations of doing "work that is routine day to day, with simple tasks, training by demonstration, and few, if any, changes" and no "contact with the general public or tandem tasks."  Tr. 27-28.  The ALJ also added the limitation that Freddette could not be exposed to potential irritants or poorly ventilated areas.  Tr. 28.

In making the RFC determination, the ALJ concluded that Freddette's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  Tr. 29.  The ALJ considered Freddette's daily activities and found that Freddette lived alone with her four-year-old son, who was hyperactive and had speech problems; cared for her son, including by preparing simple meals, bathing him, reading to him, taking him outside to play "here and there," and playing Legos with him; used public transportation; performed household chores such as cleaning, organizing, and doing laundry; helped a friend by doing her dishes and cleaning her

house; and attended to her personal care needs.  Tr. 28-29, 32.
Although Freddette reported relying on her mother for
assistance, the ALJ noted that they communicated mostly by phone
because her mother initially lived three hours away from
Freddette and later moved to Florida.  Tr. 28.

Regarding Freddette's asthma, the ALJ credited treatment
notes stating that the condition was well controlled with
medication.  Tr. 29.  In terms of her anxiety and mood
disorders, the ALJ noted that "mental status findings have
remained relatively benign, with no evidence of the severe
deficits" that Freddette described.  Tr. 29.  According to the
ALJ, Freddette's mental health issues "appear largely caused by
situational stressors including financial worries, parenting
challenges with a four-year-old son with behavioral issues,
social isolation and unemployment."  Tr. 29.

The ALJ reviewed the medical opinions in the record and
gave "great weight" to Dr. Gitlow's opinion because she found it
well supported by the objective medical evidence.  The ALJ also
noted that Dr. Gitlow had reviewed all the evidence, was
familiar with the SSA's regulations regarding disability
determination, and was a highly qualified specialist who
testified about issues in his area of specialty.  Tr. 31-32.

The ALJ gave "substantial weight" to Dr. Warren's opinion. She reasoned that his opinion was "not inconsistent with the medical evidence as a whole." Tr. 33.

The ALJ effectively adopted Dr. Griffin's opinion that Freddette could not understand complex instructions or complete complex tasks by limiting Freddette's RFC to simple tasks and training by demonstration. But the ALJ gave "very little weight" to Dr. Griffin's opinion that Freddette could not adhere to a regular work schedule, interact appropriately at work, or make work-related decisions. The ALJ reasoned that those limitations were inconsistent with Dr. Gitlow's opinion and "rely in large part on [Freddette's] subjective complaints, rather than on clinical findings." Tr. 32.

Relying on the testimony of a vocational expert, the ALJ found at step four that Freddette could performing her past relevant work as a commercial cleaner. Tr. 33. In the alternative, the ALJ found at step five that there were other jobs that existed in significant numbers in the national economy that Freddette could perform. Tr. 33-34. Accordingly, the ALJ concluded that Freddette had not been disabled from the alleged onset date through the date of her decision. Tr. 35.

## II.  STANDARD OF REVIEW

I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment

8

affirming, modifying, or reversing the "final decision" of the
Commissioner.  See 42 U.S.C. § 405(g).  That review is limited,
however, "to determining whether the [Commissioner] used the
proper legal standards and found facts [based] upon the proper
quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d
652, 655 (1st Cir. 2000).  I defer to the Commissioner's
findings of fact, so long as those findings are supported by
substantial evidence.  Id.  Substantial evidence exists "if a
reasonable mind, reviewing the evidence in the record as a
whole, could accept it as adequate to support [her] conclusion."
Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765,
769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of
Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

    If the Commissioner's factual findings are supported by
substantial evidence, they are conclusive, even where the record
"arguably could support a different conclusion." Id. at 770.
The Commissioner's findings are not conclusive, however, "when
derived by ignoring evidence, misapplying the law, or judging
matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31,
35 (1st Cir. 1999) (per curiam).  "Issues of credibility and the
drawing of permissible inference from evidentiary facts are the
prime responsibility of the Commissioner, and the resolution of
conflicts in the evidence and the determination of the ultimate
question of disability is for her, not for the doctors or for

the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018)
(internal quotation marks and brackets omitted).

### III. ANALYSIS

Freddette alleges two errors with the ALJ's RFC
determination that purportedly warrant reversal.  She first
argues that the ALJ erroneously evaluated the medical opinions
of Drs. Griffin, Gitlow, and Warren.  She then contends that the
ALJ erred in evaluating her subjective complaints.  I address,
and reject, each argument in turn.

### A. Weight Given to Medical Opinion Evidence

Freddette asserts that the ALJ improperly evaluated the
medical opinion evidence in determining her RFC.  Because
substantial evidence supports the ALJ's evaluation and her one
error was harmless, Freddette cannot sustain her burden of
establishing that remand is necessary.

A claimant's RFC is "the most [the claimant] can still do
despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).  It
must be crafted by an ALJ based on all relevant evidence in the
record.  Id.  In so doing, the ALJ "must consider limitations
and restrictions imposed by all of an individual's impairments,
even those that are not 'severe.'" Stephenson v. Halter, 2001
DNH 154, 2001 WL 951580, at *2 (D.N.H. Aug. 20, 2011) (quoting
Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5
(July 2, 1996)).  This is typically done by "piec[ing] together

the relevant medical facts from the findings and opinions of multiple physicians," Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987), but may sometimes incorporate "common-sense judgments about functional capacity" based upon those findings. Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990). The ALJ's written decision, however, need not specifically address every individual piece of evidence in the record where it would be cumulative or unhelpful to the claimant's position. See Grenier v. Colvin, 2015 DNH 133, 2015 WL 5095899, at *2 (D.N.H. July 2, 2015); Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D.N.H. 2000); see also Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. 1990) (per curiam, table decision) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.")

An ALJ must consider "medical opinions" provided by both treating and nontreating "acceptable medical sources," "together with the rest of the relevant evidence." 20 C.F.R. §§ 404.1527(a)-(b), 416.927(a)-(b); see SSR 96-8p, 1996 WL 374184, at *7. In addition, the ALJ must address such an opinion and – if it conflicts with the RFC finding – must explain why it was not adopted. SSR 96-8p, 1996 WL 374184, at *7.

The applicable regulations define "medical opinions" as "statements from acceptable medical sources that reflect

11

judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A doctor's recording of a claimant's "complaints in his notes does not convert [those] subjective complaints . . . into medical opinion, thus entitling [them] to some measure of deference." Ford v. Barnhart, 2005 DNH 105, 2005 WL 1593476, at *8 (D.N.H. July 7, 2005). Similarly, "subjective complaints are not entitled to greater weight simply because they appear in [a] physician's notes." Id.

An ALJ is generally required to "give more weight to the opinion of a source who has examined [a claimant] than to the medical opinion of a medical source who has not examined [her]." 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). "However, just as an ALJ may properly decline to give controlling weight to the opinion of a treating source, an ALJ may also discount the weight given to the opinion of an examining source in favor of the opinion of a nonexamining source." Downs v. Colvin, 2015 DNH 113, 2015 WL 3549322, at *8 (D.N.H. June 8, 2015) (internal citations omitted).

When determining the weight to give to a medical opinion, an ALJ must consider, inter alia, the nature of the relationship

12

between the medical source and the claimant, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the source of the opinion is a specialist. <u>See</u> 20 C.F.R. §§ 404.1527(c), 416.927(c). Regarding supportability, the regulations explain:

> The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion. Furthermore, because nonexamining sources have no examining or treating relationship with [a claimant], the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions. We will evaluate the degree to which these medical opinions consider all of the pertinent evidence in [a] claim, including medical opinions of treating and other examining sources.

20 C.F.R. §§ 1527(c)(3), 416.927(c)(3).

Here, the ALJ gave "very little weight" to the opinion of consultative examiner Dr. Griffin, "great weight" to the opinion of Dr. Gitlow, a nonexamining medical expert, and "substantial weight" to the opinion of Dr. Warren, a nonexamining state agency psychologist. I address each in turn.

1.  <u>Dr. Griffin's Opinion</u>

Dr. Griffin performed a consultative "Intelligence Profile" examination of Freddette at the Commissioner's request. The ALJ gave "very little weight" to Dr. Griffin's opinion that Freddette's intellectual limitations and unmanaged psychiatric

13

symptoms rendered her incapable of adhering to a regular work schedule, maintaining appropriate interactions with others at work, or making work-related decisions. Tr. 32; see Tr. 688. The ALJ reasoned that those limitations were inconsistent with Dr. Gitlow's opinion and "rely in large part on [Freddette's] subjective complaints, rather than on clinical findings." Tr. 32. The ALJ's finding is supported by evidence that is "adequate" to persuade "a reasonable mind." See Irlanda Ortiz, 955 F.2d at 769 (internal quotation marks omitted).

The ALJ was entitled to credit Dr. Gitlow's opinion over Dr. Griffin's. Dr. Gitlow disagreed with Dr. Griffin's severe limitations. He reasoned that Freddette's personality disorder and intellectual functioning "have been the same, virtually, throughout her adult life." Tr. 50. Despite those dysfunctions, she worked for one employer for 10 years and another employer for 2-3 years, demonstrating good adaptive functioning. Tr. 50, 53.

Similarly, Dr. Gitlow was unpersuaded that Freddette's anxiety and mood disorder were severe enough to support Dr. Griffin's opinion. He explained that Freddette had "a good response" to treatment and showed no signs of deficits during Dr. Griffin's exam. Tr. 51, 53. Specifically, Freddette's mood was neutral, her affect was stable and appropriate to the circumstances, her speech was normal, and she was pleasant and

cooperative. Dr. Gitlow concluded that such "presentation is not consistent with an impairing level of disease." Tr. 53-54.

Finally, Dr. Gitlow rejected Dr. Griffin's opinion that Freddette would be incapable of maintaining appropriate social interactions at work. That conclusion, he reasoned, was inconsistent with Dr. Griffin's observations that Freddette interacted well during the examination. Tr. 54-55. According to Dr. Gitlow, Freddette would not do well with a significant number of colleagues or critical supervisors but would be suited for "individual type of work place where she's not involved in significant customer or peer contact." Tr. 54.

Conflicts in the evidence, such as the difference of opinion between Dr. Gitlow and Dr. Griffin, are for the Commissioner to resolve. See Irlanda Ortiz, 955 F.2d at 769. Dr. Gitlow offered a detailed and persuasive explanation for his opinion, which bolsters its supportability. See 20 C.F.R. §§ 1527(c)(3), 416.927(c)(3). The ALJ noted that Dr. Gitlow's opinion was well-supported by the record and that he reviewed all record evidence. By contrast, Dr. Griffin had the benefit of only a handful of records. Finally, the ALJ stated that Dr. Gitlow was a highly qualified specialist who testified about issues related to his area of specialty and was knowledgeable about the SSA's disability determinations. Adjudicators are entitled to rely on such findings to credit opinion evidence.

See, e.g., 20 C.F.R. §§ 404.1527(c), 416.927(c).  Accordingly, the fact that Dr. Griffin examined Freddette and Dr. Gitlow did not is insufficient to challenge the ALJ's weighing of their opinions.  See Downs, 2015 WL 3549322, at *8.[3]

The ALJ's decision to discount Dr. Griffin's opinion as based largely on Freddette's subjective complaints is likewise supported by substantial evidence.  Although Freddette correctly notes that Dr. Griffin's report reflects a number of clinical observations summarized above, which the ALJ acknowledged in her decision, see Tr. 32, it also frequently relies on Freddette's own statements.  See Tr. 681-88.  In addition, the limited written evidence that Dr. Griffin reviewed consisted almost entirely of Freddette's subjective complaints.  See Tr. 686 (listing SSA function report that Freddette filled out and two intake summaries from Community Partners as evidence reviewed); see also Tr. 263-70 (function report); Tr. 319-45 (intake summaries).  As discussed below, the ALJ supportably found that Freddette's subjective complaints were not entirely consistent

_____

[3]     The decision in Hainey v. Colvin, upon which Freddette relies, is distinguishable.  There, the ALJ failed to adequately explain his decision to give more weight to the opinions of nonexamining medical sources than those of examining sources. See 2014 DNH 254, 2014 WL 6896022, at *6 (D.N.H. Dec. 5, 2014). Further, the nonexamining sources did not address the claimant's seemingly significant cognitive limitations and they did not review a conflicting opinion of one examining source, rendering their opinions "somewhat incomplete and less persuasive."  Id. at *6 & n.4.

with the evidence in the record. Those subjective complaints are not entitled to deference simply because they appear in Dr. Griffin's report. See Downs, 2015 WL 3549322, at *7; Ford, 2005 WL 1593476, at *8. Accordingly, I find no error in the ALJ's decision to give "very little weight" to Dr. Griffin's opinion and "great weight" to Dr. Gitlow's opinion.

   2.   Dr. Gitlow's Opinion

   Freddette faults the ALJ for failing to include in the RFC finding a limitation consistent with Dr. Gitlow's opinion that she could only interact with a "[l]imited number of people" at work if "the same people . . . are there day-to-day." Tr. 55-56. Despite giving Dr. Gitlow's opinion "great weight," the ALJ did not expressly address this limitation. The Commissioner argues that the RFC finding is still sufficient because the ALJ limited Freddette to jobs that entailed "few, if any, changes" and required neither any "contact with the general public" nor any "tandem tasks." See Tr. 33. Alternatively, the Commissioner maintains that the omission is a harmless error because Freddette's past relevant work and the other jobs the vocational expert identified all have the lowest-possible rating for social interaction, which accommodates Dr. Gitlow's opinion.

   The RFC finding does not account for general interaction with coworkers. I agree with the Commissioner that limiting Freddette to jobs that entailed "few, if any changes" includes

17

changes to the people who are at work and thus incorporates Dr. Gitlow's opinion about Freddette's need to work with the same people. But precluding contact with the public does not accommodate the limitation on coworker interactions.

The ALJ seemingly sought to address this restriction by excluding "tandem tasks," which presumably involve collaborative interaction with coworkers. No medical opinion in the record used that term, however, and the parties have not cited a pertinent source that defines it. Accordingly, I cannot determine from this record whether a bar on tandem tasks could in fact be equated with Dr. Gitlow's limitation on workplace interactions.[4]

A remand on this basis is not warranted, however, because the ALJ's error is harmless. Courts routinely find harmless error "where an alleged limitation that was not included in the ALJ's hypothetical (or in the RFC) was not necessary to perform one or more of the jobs identified by the [vocational expert], according to the [Dictionary of Occupational Titles]." Rochek v. Colvin, No. 2:12-CV-01307, 2013 WL 4648340, at *12 (W.D. Pa. Aug. 23, 2013) (collecting cases). The ALJ ultimately found

---

[4] I reject the Commissioner's invitation to conclude that the ALJ discounted Dr. Gitlow's opinion on this matter in favor of Dr. Warren's, which does not include a similar limitation. The ALJ generally gave more weight to Dr. Gitlow's opinion than Dr. Warren's, and the RFC finding is otherwise more consistent with the former than the latter.

that Freddette was not disabled by relying on the vocational expert's testimony that a person with Freddette's RFC could perform her past relevant work as a commercial cleaner and three other jobs. The Dictionary of Occupational Titles ("DOT") assigns the lowest-possible rating for social interaction ("people" code) to each of those jobs and provides that social interaction is "Not Significant" in any of them. See DOT § 381.687-014, 1991 WL 673257 (commercial cleaner); DOT § 920.687-126, 1991 WL 687992 (marker II); DOT § 921.685-046, 1991 WL 688088 (fruit distributor); DOT § 712.687-010, 1991 WL 679245 (assembler, plastic hospital products). Numerous courts have found jobs with that rating appropriate for claimants with RFC specifying limited coworker contact because such jobs involve workplace interactions that are only "occasional," "brief" and "superficial." See Sweeney v. Colvin, No. 3:13-cv-02233, 2014 WL 4294507, at *17 (M.D. Pa. Aug. 28, 2014) (collecting cases).

Because the ALJ identified jobs that Freddette could perform even if Dr. Gitlow's limitation were imported, the error in failing to assess it was harmless.

### 3. Dr. Warren's Opinion

Freddette argues that the ALJ's decision to give "substantial weight" to the opinion of state agency psychologist Dr. Warren is not supported by substantial evidence. This is because, she asserts, Dr. Warren "fail[ed] to evaluate the

opinion evidence from Dr. Griffin's consultative examination,"
as evidenced by his statement that there was no medical or other
opinion evidence in the record.  See Doc. No 8-1 at 7.  This
challenge is meritless.

Dr. Warren explicitly and repeatedly indicated that he had
evaluated Dr. Griffin's report.  See Tr. 102 (listing Dr.
Griffin's report as first item in list of evidence of record);
Tr. 105 (citing Dr. Griffin's report as "Psych CE" and noting
that it "[s]hows B[orderline] I[intelligence] F[unctioning] and
G[eneralized] A[nxiety] D[isorder]"); Tr. 106 (noting "[r]ecent
mental CE suggests borderline intelligence").  The fact that Dr.
Warren did not list Dr. Griffin's report as opinion evidence or
discuss it at length does not mean that he failed to consider
it.  To the extent Freddette argues that Dr. Warren was required
to expressly reconcile his opinion with Dr. Griffin's, she cites
no authority to support that proposition, and I have found none.

Because Dr. Warren's opinion is supported by substantial
evidence, including relatively benign mental status findings and
evidence of Freddette's daily activities, the ALJ properly
assigned it substantial weight.

B.    **Subjective Symptom Evaluation**

Freddette also argues that the ALJ's RFC determination
cannot stand because the ALJ did not properly evaluate her
subjective complaints.  I find that the ALJ supportably

discounted Freddette's subjective reports regarding the intensity, persistence, and limiting effects of her symptoms as "not entirely consistent with the medical evidence and other evidence in the record."  Tr. 29.

In crafting a claimant's RFC, an ALJ must consider all of a claimant's alleged symptoms and determine the extent to which those symptoms can reasonably be accepted as consistent with objective medical evidence and other record evidence.  20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016).  This involves a two-step inquiry.  First, the ALJ must determine whether the claimant has a "medically determinable impairment" that could reasonably be expected to produce her alleged symptoms.  SSR 16-3p, 2016 WL 1119029, at *3.  Second, the ALJ evaluates the "intensity, persistence, and limiting effects of [those] symptoms" to determine how they limit the claimant's ability to perform work-related activities. Id. at *4.  The ALJ must "examine the entire case record" in conducting this evaluation, including objective medical evidence, the claimant's own statements and subjective complaints, and any other relevant statements or information in the record.  Id.; see Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018) (quoting SSR 16-3p, 82 Fed. Reg. 49462 (Oct. 25, 2017)) (republished without substantial change).

21

When a claimant's statements are inconsistent with
objective medical evidence, an ALJ must evaluate the veracity of
the claimant's descriptions of the intensity, persistence, and
limiting effects of her symptoms.  See Floyd v. Berryhill, 2017
DNH 114, 2017 WL 2670732, at *5 (D.N.H. June 21, 2017); SSR 16-
3p, 2016 WL 1119029, at *4.  The ALJ cannot reject the veracity
of the claimant's own statements, however, solely because they
are unsubstantiated by objective medical evidence.  20 C.F.R. §§
404.1529(c)(2), 416.929(c)(2); see Clavette v. Astrue, No. 10-
cv-580, 2012 WL 472757, at *9 (D.N.H. Feb 7, 2012), R. & R.
adopted, 2012 WL 472878 (D.N.H. Feb. 13, 2012); Valiquette v.
Astrue, 498 F. Supp. 2d 424, 433 (D. Mass. 2007).  Rather, an
inconsistency between subjective complaints and objective
medical evidence is just "one of the many factors" to consider
in weighing the claimant's statements.  SSR 16-3p, 2016 WL
1119029, at *5; see Makuch v. Halter, 170 F. Supp. 2d 117, 127
(D. Mass. 2001).[5]

---

[5]     The principle that an ALJ may not rest a negative
credibility assessment solely on the lack of corroborating
objective medical evidence was developed under application of
SSR 96-7p.  See, e.g., Makuch, 170 F. Supp. 2d. at 126-127; Ault
v. Astrue, 2012 DNH 005, 2012 WL 72291, at *5 (D.N.H. Jan. 10,
2012).  This ruling has since been replaced by SSR 16-3p.  See
Coskery, 892 F.3d at 4; SSR 16-3p, 2016 WL 1119029, at *1.  SSR
96-7p had been construed to only require an ALJ to assess a
claimant's "credibility" in the event her subjective statements
were unsubstantiated by the objective medical record.  See
Guziewicz v. Astrue, 2011 DNH 010, 2011 WL 128957, at *6 (D.N.H.
Jan. 14, 2011).  Therefore, it was deemed legal error for an ALJ

Other factors the ALJ must consider, known as the "Avery factors" in the First Circuit, include (1) the claimant's daily activities;(2) the location, duration, frequency, and intensity of the pain or symptom; (3) any precipitating and aggravating factors; (4) the effectiveness of any medication currently or previously taken; (5) the effectiveness of non-medicinal treatment; (6) any other self-directed measures used to relieve pain; and (7) any other factors concerning functional limitations or restrictions. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see also Childers v. Colvin, 2015 DNH 142, 2015 WL 4415129, at *5 (D.N.H. July 17, 2015) (citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)). But the ALJ is not required to address every Avery factor in her written decision for her evaluation to be supported by substantial evidence. Ault, 2012 WL 72291, at *5. Instead, the decision need only "contain *specific reasons* for the weight

---

to discredit a claimant's statements solely for lacking corroborating objective evidence. See, e.g., Clavette, 2012 WL 472757, at *9. In enacting SSR 16-3p to replace SSR 96-7p, the SSA primarily sought to "eliminate the use of the term 'credibility' from the sub-regulatory policy to make clear that a subjective symptom evaluation is not an examination of an individual's character." Coskery, 892 F.3d at 6 (citing SSR 16-3p, 82 Fed. Reg. at 49463 & n.1) (internal quotation marks and brackets omitted); SSR 16-3p, 2016 WL 1119029, at *1 n.1. Despite that change, SSR 16-3p is materially the same as its predecessor, and it explicitly precludes an ALJ from "evaluat[ing] an individual's symptoms based solely on objective medical evidence." See SSR 16-3p, 2016 WL 1119029, at *4

given to the individual's symptoms, be consistent with and

supported by the evidence, and be clearly articulated so the

individual and any subsequent reviewer can assess how the

adjudicator evaluated the individual's symptoms." SSR 16-3p,

2016 WL 1119029, at *9 (emphasis added); see Anderson v. Colvin,

2014 DNH 232, 2012 WL 72291, at *7 (D.N.H. Nov. 4, 2014).

　　　Here, the ALJ sufficiently explained her decision to credit

Freddette's subjective complaints "only to the extent they can

reasonably be accepted as consistent with the objective medical

and other evidence." Tr. 29. For example, the ALJ noted that

Freddette had a good response to treatment. Tr. 28, 29, 30.

She also stated that Freddette's daily functioning undermined

her subjective claims of fully debilitating symptoms.

Specifically, the ALJ noted that Freddette lived independently

with her four-year-old son who had behavioral problems; cared

for him by preparing simple meals, bathing him, reading to him,

playing Legos with him, and occasionally taking him outside to

play; used public transportation; performed household chores

such as cleaning, organizing, and doing laundry; helped a friend

by doing her dishes and cleaning her house; and attended to her

personal care needs. Tr. 28-29, 32. Such an explanation

provides a sufficiently specific reason for the weight given to

Freddette's testimony. Cf. Teixeira v. Astrue, 755 F. Supp. 2d

340, 347 (D. Mass. 2010) ("While a claimant's performance of

household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.").

In addition, the ALJ noted that during her consultative examination with Dr. Griffin, Freddette completed intake paperwork independently (albeit slowly) and "was able to follow along with the natural flow of the examination." Tr. 26. The ALJ also observed that Freddette was able to respond appropriately when spoken to and initiate conversation and was pleasant and responsive to questioning during the hearing. Tr. 26. The ALJ's observations support her decision to discount Freddette's statements that endorse a higher degree of impairment. See Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 448 (1st Cir. 1991) (ALJ properly relied on his "observation of claimant's demeanor at the hearing" when discounting claimant's subjective complaints).

The ALJ also considered Freddette's past work history and noted that despite her professed difficulty getting along with coworkers and supervisors, she worked at one facility for 10 years and at another for 2-3 years. Tr. 29, 30. In fact, Freddette testified that on several occasions she stopped working for reasons unrelated to her mental health conditions. See Tr. 65 (testifying that her pregnancy and her employer's

decision to reduce her hours explained why she stopped one job);
Tr. 67 (testifying that she was fired from another job for
working unauthorized overtime).  The ALJ was entitled to rely on
the inconsistency between Freddette's past work record and her
statements that she could not work to discount her testimony.
See Lewis v. Berryhill, 722 F. App'x 660, 662 (9th Cir. 2018)
(ALJ properly rejected claimant's testimony in part based on
"inconsistencies between [claimant's] testimony and her ability
to work in the past despite her limitations"); Bruton v.
Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (ALJ properly
considered claimant's stated reasons for leaving past work in
discrediting claimant's testimony).

        In terms of precipitating and aggravating factors, the ALJ
found that Freddette's conditions were largely caused by
situational stressors, including financial concerns, parenting
challenges, social isolation, and unemployment.  Tr. 29.  An ALJ
may consider whether a claimant's symptoms result from temporary
situational stressors in discounting her subjective complaints.
See West v. Berryhill, No. 17-1170, 2017 WL 6499834, at *1 (1st
Cir. Dec. 11, 2017) (noting that ALJ's RFC determination was
supported by "evidence that temporary situational factors
contributed to heightened symptoms"); Chesler v. Colvin, 649 F.
App'x 631, 632 (9th Cir. 2016) (symptom testimony properly
rejected in part because "the record support[ed] the ALJ's

conclusion that [claimant's] mental health symptoms were situational").[6]

In sum, the ALJ provided specific reasons, supported by substantial evidence, to discount Freddette's subjective complaints.  Her finding is entitled to deference.

### IV. CONCLUSION

Pursuant to sentence four of 42 U.S.C. § 405(g), I grant the Acting Commissioner's motion to affirm (Doc. No. 11), and I deny Freddette's motion to reverse and remand (Doc. No. 8).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

January 7, 2019

cc:  Robert J. Rabuck, Esq.
     D. Lance Tillinghast, Esq.

---

[6]     Freddette states that the treatment notes the ALJ cited describe her situational stressors as "risk factors" as opposed to "causes" of her mental health impairments.  She does not explain the relevance of this distinction, let alone cite any supporting authority.  To the extent there is a meaningful difference, it suffices to say that the treatment notes state that Freddette's anxiety was "related to" one of those stressors, supporting the ALJ's characterization of the record. See Tr. 808, 810.